William C. **COLEMAN**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

**No. 19193.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 15, 1965.

Decided Oct. 28, 1965.

Tamm, Danaher, and Burger, Circuit Judges, dissented.

Mr. Robert L. Weinberg, Washington, D. C., with whom Mr. Edward Bennett Williams, Washington, D. C. (both appointed by this court) was on the brief for appellant.

Mr. Jerome Nelson, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., at the time the brief was filed, and Frank Q. Nebeker and Alfred Hantman, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and FAHY, WASHINGTON, DANAHER, BURGER, WRIGHT, McGOWAN, TAMM and LEVENTHAL, Circuit Judges, sitting *en banc*.

FAHY, Circuit Judge, with whom BAZELON, Chief Judge, and WASHINGTON, WRIGHT, McGOWAN and LEVENTHAL, Circuit Judges, join:

■ Appellant was convicted June 11, 1960 of first degree murder in the killing of a police officer while perpetrating a robbery. 22 D.C.Code § 2401. He was sentenced to death under the mandatory death penalty in force in the District of Columbia at the time of his conviction. 22 D.C.Code § 2404. This court sitting *en banc* affirmed in Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555, with four judges dissenting in part, cert. denied, 369 U.S. 813, 82 S.Ct. 689,

7 L.Ed.2d 613, rehearing denied, 369 U.S. 842, 82 S.Ct. 870, 7 L.Ed.2d 847. We refer to this decision as *Coleman I*. While the case was pending in the courts Congress abolished the mandatory death sentence [1] for first degree murder in this jurisdiction. 22 D.C.Code § 2404 (Supp. IV, 1965). At the same time Congress provided,

Cases tried prior to March 22, 1962, and which are before the court for the purpose of sentence or resentence shall be governed by the provisions of law in effect prior to March 22, 1962: *Provided*, That the judge may, in his sole discretion, consider circumstances in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of life imprisonment, in which event he shall sentence the defendant to life imprisonment. * * *

22 D.C.Code § 2404.

A week after the passage of this statute appellant filed a motion in the District Court seeking relief under the new law, which was denied. The death sentence thus remained in effect. On appeal we remanded the case to the District Court to conduct an evidentiary hearing to aid in the consideration of "circumstances in mitigation and in aggravation." Coleman v. United States, 118 U.S.App.D.C. 168, 334 F.2d 558, referred to as *Coleman II*. Prior to the hearing appellant filed an amended motion for imposition of life imprisonment. An extensive hearing followed, held by Judge McGarraghy, who was not the trial judge, after which he denied both the original and amended motions, filing a Memorandum giving his reasons.

## I

Before testimony was heard at the remand proceedings the following colloquy took place:

---

1. The statute abolishing the mandatory death penalty leaves the determination whether the sentence shall be death or life imprisonment to the jury or, if the jury cannot agree on the punishment, to the judge. See Frady and Gordon v. United States, 121 U.S.App.D.C. 78, 348 F. 2d 84.

THE COURT: I am of the opinion it is not a resentencing under the opinion of the Court of Appeals but is a matter of motion for reduction of sentence.

MR. WEINBERG [Attorney for Coleman]: Is it Your Honor's ruling that the Defendant has the burden of proving it?

THE COURT: Yes, that would be my ruling.

No more is necessary to demonstrate that the judge considered the burden to be upon appellant to establish that the sentence should be reduced. His position is further indicated in his Memorandum above referred to in which he said:

The amendatory law as finally enacted expressly provided that cases tried prior to the effective date of the Act shall be governed by the provisions of law in effect prior to the effective date of the Act (mandatory death by electrocution) subject only to the procedure under which the Judge may reduce the sentence to life imprisonment.

 We think it was error to consider the matter as though the burden was upon appellant to convince the court that the sentence should be reduced. The previous sentence of death should have been considered as lifted, to be replaced by a new sentence; that is, there was to be a resentencing. Unless the judge determined that life imprisonment was justified he was to impose the death sentence, but in making his determination no weight was to be given to the fact that under the law at the time of the conviction a sentence of death was mandatory.

It is true that a majority of this court, in remanding the case in *Coleman II*, did not join in stating that the duty of the trial judge was that of resentencing; but it is also clear the court did not place the burden upon the defense. The majority opinion summarized the position as follows:

To recapitulate, Congress by the pertinent portion of Public Law 87–423 [22 D.C.Code § 2404, as amended March 22, 1962] intended to create a mechanism here applicable to a previously convicted murderer by which the judge might determine whether the case "justifies a sentence of life imprisonment."

118 U.S.App.D.C. at 173, 334 F.2d at 563. We referred to Jones v. United States, 117 U.S.App.D.C. 169, 327 F.2d 867 *(en banc)*. The concurring opinion there was more explicit:

Public Law 87–423 does not put the burden of proof upon the defendant to show that he should not be executed. It simply states that the judge, in resentencing, "may, in his sole discretion, consider circumstances in mitigation and in aggravation." The House Committee Report explains this language: "If the factors in aggravation outweigh those in mitigation, [the judge] shall impose a sentence of death by electrocution. If, in his judgment, the factors in mitigation outweigh those in aggravation, he shall impose a sentence of life imprisonment." Thus Congress placed the burden on the court to avail itself of all relevant information which may be helpful in imposing the proper sentence.

The original death sentence was fixed by statute. Judge Letts, the trial judge, had no choice whatever as to the sentence. If it had been originally imposed as the result of the exercise of Judge Letts' discretion a reasonable argument could be advanced that the burden rested upon appellant to convince Judge McGarraghy that the sentence should be reduced. But as we have said Judge Letts could exercise no discretion in the matter. Under the transitional statute of March 22, 1962, for the first time a sentencing judge was authorized to make an independent determination between life and death. In doing so he was to receive all relevant information and make a judgment of his own. In this posture of the matter appellant was not charged

with the burden of overcoming the weight of the sentence which had been fixed by statute without the guidance of the trial judge's appraisal of the circumstances of the particular case as they bear upon the punishment.

A separate but related phase of the problem revolves around what the judge termed the circumstances of the crime. The decision in *Coleman I* was that Coleman was validly convicted of first degree, felony murder. This leads now to a sentence of either life imprisonment or death, but not necessarily the latter. Either penalty is now permissible for such a crime. Other circumstances must be considered in determining which of these two penalties shall be imposed.

The murder was of a young police officer in the performance of duty. This is an aggravating circumstance, recognized as such by the judge. He stated in his Memorandum:

> police officers are engaged in the dangerous business of protecting the public from vicious criminals and, when they become the victims of such criminals, the public interest, both from the point of view of deterrence and of punishment, requires that the penalty fixed by law be carried into effect.

But this statement also indicates that he thought the punishment fixed by law in this case was death. In the same tenor he said that in his opinion the case,

> does not justify a sentence of life imprisonment, but that the sentence shall be governed by the provisions of law in effect prior to the effective date of Public Law 87–423.

The views thus expressed by the sentencing judge disclose, we say with respect, that he reached his ultimate determination by an erroneous process. The full text of the Act of March 22, 1962, including the proviso, means that

there is no one penalty "fixed by law" in this case. There are two alternative penalties either of which if validly determined is permitted by law. Yet, it appears reasonably clear, the judge thought that since the case was tried prior to March 22, 1962, weight should be given to the law as it was at the time of the trial, carrying a mandatory death sentence. This approach was not intended by Congress. Though the case was tried prior to March 22, 1962 the judge was to impose punishment under the law of that date;[2] but he was not to give weight to the fact that prior thereto the death sentence was the sole punishment. It can hardly be thought that the pre-existing mandatory death sentence, once it was abolished, was to be given weight in this case not applicable to a case tried subsequent to March 22, 1962.[3]

The matters thus far discussed lead us to conclude that notwithstanding the sentencing judge's conscientious approach to his difficult responsibility the result was influenced by errors.

We need go no further to find the present death sentence invalid; but in aid of a final disposition of the case, as well as in deference to the sentencing judge and the presentations of the parties, we dwell further upon the sentencing record.

## II

The conviction calls for severe punishment, no less than life imprisonment. That more should not be required was supported by a number of additional considerations presented by appellant's counsel, accompanied by the testimony of a number of witnesses. A record was made of appellant's background, his retarded mental capacity, circumstances attending the commission of the crime not adduced at the trial, post-conviction factors and factors arguing against the

2. In a case tried after March 22, 1962, the jury participates in determining punishment.

3. It may be that in giving weight to the pre-existing law the judge had in mind again that the burden of proof was upon appellant to support a reduction of sentence; but in any event we are clear that the weight ascribed to the pre-existing law was erroneous.

death sentence in general and in this particular case.

The judge in his Memorandum summarized appellant's background and mentality as thus presented. He was born in 1934 in Louisa County, Virginia, one of a family of nine children. He completed the 8th grade in the county public schools. All the family, including appellant, bear a good name among both white and Negro members of the community. The crime is in sharp contrast to appellant's known behavior pattern in the county. Due to limited employment opportunities he like many others left the community in order to obtain full-time employment. He came to Washington when he was 17 years of age. He worked as an apartment house porter and for a year or so lived with his brother Raymond and the latter's girl friend. He then moved to rooming houses until his arrest. The judge continued:

> After leaving the job as apartment house porter, the defendant held a number of part-time jobs and in 1953, he went to work as a helper and finally as a truck driver for a Washington firm, for which he worked from October 22, 1953 to November 14, 1956 when he was drafted into the Army. Upon his honorable discharge from the Army he returned to that firm and continued to work from January 20, 1958 until he was discharged from his employment on December 23, 1959 because he was suspected of participation in the theft of company property.

> Notwithstanding his discharge, it is reasonable to conclude from the statement of his superior with the company that he was a good worker and a better worker than most of his 16 or 18 coworkers engaged in the same type of employment.

The occurrence which led to the defendant's conviction was on January 7, 1960, approximately three weeks after his discharge from employment, during which period he was unemployed and gradually becoming without funds.

The defendant was never married. For several years prior to his arrest in the instant case, he had a girl friend with whom he lived from time to time. At the time of the robbery and murder, the girl friend knew he was out of work and offered to support him until he got another job, but he declined the offer.

After about a year's service in the Armed Forces he was honorably discharged under the Army program of separating servicemen of low I Q; his I Q was about 71. He is of subnormal intelligence but functioned satisfactorily as a laborer and truck driver. The judge also stated there was no evidence of abnormal emotional instability, nor that he was psychotic, though he might be expected to be suggestible and influenced by others for whom he had respect and admiration. He had a serious alcohol problem. *"When he was a very small boy, he began drinking small quantities of whiskey furnished by his father."* (Emphasis supplied.)

The judge continued substantially as follows: It was the brother's idea to rob the liquor store. He suggested it, pointing out that if they were successful the appellant would not have to leave Washington as he was planning to do because of his lack of money and job. Appellant agreed and turned over to the brother a gun owned by appellant which the brother intended to use and did use in the holdup while appellant took the money from the cash register. The appellant and his brother fled from the store and ran in opposite directions. When he was confronted by Officer Brereton in the alley, appellant became frightened and panicked. The scuffle and the shooting of Officer Brereton with his own gun followed. Appellant ran from the scene, hailed a taxicab, went home, hid the gun, and spent his time going from friend to friend and after two days surrendered to the authorities.

The Memorandum sets forth also a brief statement of appellant's post-conviction conduct, including a recommendation of the Catholic prison Chaplain that the sentence be reduced. Appellant had been confined in the prison some four years.

The judge concludes this part of his Memorandum as follows:

> The total of the evidence reasonably supports the conclusion that the defendant has been a model prisoner. He is a fairly good influence on those who are around him. He would be a good risk for rehabilitation. The possibilities of recidivism are remote. He has adjusted well to prison life and would be a good influence to the prison community.

The Protestant Chaplain's testimony strongly supports this conclusion. We quote:

> Well, I have a belief in the possibility of change within people, I suppose, or I wouldn't be working in a prison situation. But I do believe that the experience that Coleman has been through, and his response to it, have made considerable change in him. Then again, I am not qualified to weigh his personality, or anything, but it seems to me that four years—it is better than four years now—of his experience had made enough change that I do not believe he would get into the kind of situations he has been in in the past or if in them would respond in the same way. I would regard him as enough different in degree as almost to be different in kind, if that makes any sense.

> \* \* \* \* \* \*

> I certainly feel that he would be a person who could get along in a prison environment, and I have the feeling that he would have the possibility under a life sentence of making the kind of contribution to other inmates by his example and his influence that might really in one sense be a deterrent to this type of crime, whereas it is not my observation or my belief that the death sentence is very much of a deterrent.

> In other words, I feel that he is a person who could and would seek to have influence on the men around him in a prison situation, which would be a good moral influence, and that he would be in a position to make a constructive or positive contribution in a prison setting. And I further believe that if he demonstrated, as I feel he could, his adjustment in prison, that he would yet have, even after service of twenty-year sentence, a possibility of a law-abiding life in the free community.

> \* \* \* \* \* \*

> [S]peaking of Coleman as an individual, I feel that there is much more to be said for his life being spared, and it would be my recommendation that the sentence be reduced to life.

> \* \* \* \* \* \*

> In all my talks with him [he] has been consistently repentant and remorseful and has not been a person who sought to excuse himself by blaming someone else.

> I think this is the area where I see a difference between him and some of the other men.

> \* \* \* \* \* \*

> There are men who refuse to accept responsibility, nor do they have any sense of remorse. I think it was more a sense of repentance and remorse which I found in him.

Mr. William E. Hemple, United States Probation Officer, testified that the indications of poor prospect of rehabilitation are not present in appellant's case and that his "personal recommendation would be for imposition of the life sentence." He based this upon his knowledge and training as a probation officer and also his personal feeling of opposition to the death penalty.

Much additional evidence was presented. We mention of special interest the testimony of Dr. Francis F. Barnes bearing on appellant's mental deficiency and its relation to the homicide, with particular reference to appellant's state of panic

when he was cornered by the officers. We refer also to the testimony of Dr. Albert E. Marland, called by the United States to testify as to appellant's mental retardation. He spoke of appellant's favorable prospects of rehabilitation. And there is the testimony of Professor Thorsten Sellin, Professor of Sociology at the University of Pennsylvania. He analyzed the subject of deterrent effect of capital punishment for homicide offenses, with particular reference to homicides of police officers. Dr. Bertram S. Brown, a psychiatrist, testified as to the relation of mental retardation to homicide, with particular reference to this case. There was also brought into the record, at the instance of the United States, statistical data covering the past several years as to indictments in this jurisdiction for first degree murder, and the number and disposition of homicide cases since 1954 involving the killing of a policeman in line of duty.

The above outline fails to do justice to the excellence of the record on the subject of whether life imprisonment or death should be the punishment in this case. The court is indebted to counsel for appellant appointed by this court, to the witnesses, and to the office of the United States Attorney. The participation of the latter was limited to a probing and clarification of the evidence, with no recommendation as to punishment.[4]

The judge concluded that none of the circumstances of defendant's life, his mental condition, or of the crime itself, is in mitigation of punishment. This conclusion is not stated to be the result of weighing the mitigating and aggravating circumstances and finding the latter to outweigh the former. The judge said that none of the circumstances referred to is in mitigation of punishment. That we do not misconstrue his position is shown also by the following statement in his Memorandum:

> The reports of the Chaplains of the adjustment which the defendant has made in the places of his confinement are encouraging and, if factors of a mitigating character were present, they would carry weight in resolving the issue. However, standing alone, his subsequent conduct in prison is not a circumstance in mitigation of punishment.

Thus he expressed his view that "factors of a mitigating character" were not present.

Thereafter he stated:

> Upon consideration of all the circumstances in mitigation and in aggravation, it is the determination of the Court that the case, in its opinion, does not justify a sentence of life imprisonment, but that the sentence shall be governed by the provisions of law in effect prior to the effective date of Public Law 87–423.

This seems inconsistent with his earlier statements that he found no mitigating circumstances. The inconsistency cannot be resolved in so serious a matter by assuming he weighed as mitigating circumstances those which he had rejected as such.

■ In deciding as between life imprisonment or electrocution we cannot accept as valid a process which excluded from consideration many circumstances bearing upon the issue and required by the very terms of the Act of March 22, 1962, to be considered because of their mitigating character. Among these we mention the absence of premeditation,[5] the fact that appellant was unarmed at the time, that he panicked, that the homicide was sudden and unplanned by a mentally retarded man whose mind was further clouded by drink, and appellant's postconviction record as explained by the Probation Officer and the Chaplains. Whether the mitigating circumstances outweighed the aggravating circumstances that the victim of the homicide

---

4. In this court the United States supports the action of the sentencing judge as valid.

5. The United States did not ask for a first degree murder conviction on the basis of premeditation.

was an officer performing his duty, or vice versa, was not decided.

It is suggested that we should conclude that the judge did weigh all circumstances mitigating and aggravating. We are not at liberty to place the sentencing judge's position other than where he himself placed it. Moreover, if we are wrong in our interpretation of this phase of the process he followed, still the result reached cannot be sustained because of the independent errors considered in Part I of this opinion; that is, the placing of the burden upon appellant to establish that the sentence should be reduced, and the weight given to the fact that the trial occurred when the death sentence was mandatory.

### III

We are asked to hold that the judge erred also in not considering as mitigating circumstances certain court decisions rendered since the trial of the case, particularly Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; Greenwell v. United States, 119 U.S.App.D.C. 43, 336 F.2d 962; Jones, Short and Jones v. United States, 119 U.S.App.D.C. 284, 342 F.2d 863. It is urged that these decisions bring in question the validity of the conviction itself. The incident of a pre-trial statement of a prosecution witness which was not made available to counsel for the defense at the trial, is also said to undermine further the validity of the conviction. The problems thus presented, as bearing upon the fairness of the trial and the rules governing the admission of evidence, could better have been considered by the trial judge as they might affect the punishment to be imposed, were he available to have considered the sentence under the Act of March 22, 1962. The judicial history of the case, as reflected particularly in Coleman I and in the Supreme Court, 369 U.S. 813, 842, 82 S.Ct. 689, 870, may be thought also to bear upon the punish-

ment. But we find it unnecessary to pass upon the effect of the failure of the designated judge to consider these matters in mitigation. Limiting ourselves to the reasons set forth in Parts I and II of this opinion we hold that in determining not to disturb the death sentence he pursued a process which was erroneous in law.

### IV

■ It will be seen from the foregoing that in our view the learned judge followed incorrect standards in making his determination as to the punishment. Our decision for this reason that the present sentence cannot be sustained precludes the application to this case of the well settled rule that an appellate court will not disturb a sentence imposed by a trial court within the latitude allowed by statute.[6] The rule referred to assumes the absence of error in the sentencing process. That it does not here apply would seem obvious. The death sentence earlier imposed upon this very appellant was refused approval by seven members of this court in Coleman II (Chief Judge Bazelon and Circuit Judges Fahy, Washington, Danaher, Burger, Wright and McGowan) notwithstanding the reference in the Act of March 22, 1962, to the "sole discretion" of the judge. In Jones v. United States, supra, this court likewise refused to approve the death sentence there under consideration, notwithstanding the same "sole discretion" language. And we did the same in Frady and Gordon v. United States, supra. Broad as his discretion may be a sentencing judge must always conform with the law governing the sentencing function. As further illustrative, Judge Burger and Judge McGowan joined in remanding Coleman II because the sentencing judge had not afforded Coleman the right of allocution before imposing the death sentence, notwithstanding the "sole discretion" language of the sentencing statute. Supreme Court decisions were

6. Illustrative of the cases are Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405; Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306; United States v. Rosenberg, 2 Cir., 195 F.2d 583; Gurera v. United States, 8 Cir., 40 F.2d 338.

relied upon. See Van Hook v. United States, 365 U.S. 609, 81 S.Ct. 823, 5 L. Ed.2d 821, citing Green v. United States, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670. And see Leach v. United States, 115 U.S. App.D.C. 351, 320 F.2d 670; and Peters and Mills v. United States, 113 U.S.App. D.C. 236, 307 F.2d 193. No case refutes this principle of law. None advanced against our present decision involves a sentence where the judge had followed erroneous sentencing standards. Each is a case where the applicable sentencing process had been complied with, so that the choice of sentence within the latitude allowed by statute bound the appellate court. It is interesting in this connection to note that in Jones v. United States, *supra,* where we said,

> It is clear beyond peradventure that this court had and has no control over a sentence which comports with the applicable statute, "even though it be a death sentence." Nor may we reduce or modify a sentence nor require a trial judge to do so. * *

we refused to affirm the death sentence there under review, for the sentencing judge had not afforded the appellant a proper hearing.

We close this branch of our discussion by referring to the statutory description of the discretion lodged in the judge by the Act of March 22, 1962. It is a sole discretion to "consider circumstances in mitigation and in aggravation," and to make his determination upon such consideration. It is not a discretion to fail to consider circumstances in mitigation, or to err with respect to the burden of proof or as to the weight given to the mandatory character of the death sentence prior to the Act of March 22, 1962.

## V

We consider now whether to remand the case for consideration of the sentence a third time, or to direct its final disposition. A number of factors bear upon this question.

The sentencing process contemplated by Congress in the Act of March 22, 1962, cannot be reconstructed in the District Court. This grows out of the situation resulting from the abolition of the mandatory death sentence for first degree murder. Congress desired the benefit of the change in legislative policy to be in some manner accessible to a few persons theretofore convicted of first degree murder but whose death sentences had not been carried out. Congress vested a discretion in the judge as set forth in the Act of March 22, 1962. The judge there referred to, however, is the trial judge. The trial judge in this case was Judge Letts. It was not Judge McGarraghy. Judge Letts was unable to exercise his discretion and has since departed this life. Judge McGarraghy was designated by Chief Judge McGuire. In *Coleman II* we sustained the validity of this designation, relying upon Rule 25, Fed. R.Crim.P.[7] The designation under this Rule it will be seen assumes that, Judge McGarraghy was not the judge contemplated by Congress to determine the sentence under the Act of March 22, 1962. And whatever discretion accompanied the designation was without benefit of the views of the judge who presided over the trial and heard the evidence, whose views Congress contemplated would prevail. Moreover, the judge designated under Rule 25 has twice decided upon the death sentence, this time in a manner we cannot approve for the reasons stated in Parts I and II of this opinion. Clearly it would not be "just under the circumstances," see Section 2106, *infra,* or fair either to Judge McGarraghy or to appellant to require Judge McGarraghy to assume the burden a third time and try

---

**7.** This Rule provides:

> If by reason of absence from the district, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

to free himself of his firmly held view, twice acted upon, that the death sentence should be exacted. If the case were remanded to him and he became "satisfied that he cannot perform" the duties of the trial judge, Rule 25, see note 7 *supra,* it would appear from the terms of the Rule that a new trial could be required, notwithstanding this court in *Coleman I* has sustained the validity of the conviction itself.

Thus, we have a situation where not only is the trial judge not available to determine the sentence under the Act of March 22, 1962, but, in addition, the case may not be remanded to the judge who we held in *Coleman II* had been designated consistently with Rule 25.

■ Three possible courses remain open for consideration:

1. To grant a new trial so that the trial judge or jury, see 22 D.C.Code § 2404, would participate in the sentencing process in event of conviction. We think it is not necessary to adopt this course in order to cure the errors respecting the imposition of the death sentence. We should order a new trial only if no other means of rectifying the matter of punishment were available.

2. Should we remand for designation of a third judge to hold an entirely new hearing and resentence appellant? If so, by what authority? Rule 25 contemplates no such procedure. If our inherent authority is looked to it is no greater than or different from the authority we have by virtue of 28 U.S.C. § 2106. This Section reads as follows:

Determination

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further

proceedings to be had as may be just under the circumstances.

The terms of Section 2106 [8] do not require the designation of a third judge, assuming they permit it. Under those terms we may "direct the entry of such appropriate judgment * * * or require such further proceedings to be had as may be just under the circumstances." Reference of the matter to a third judge is not within the contemplation either of the Act of March 22, 1962, or of Rule 25. Moreover, the new record required as a consequence of such a reference would lack the aid of the trial judge on the crucial issue of punishment. When we sustained the designation of a judge other than the trial judge to consider the sentence we went as far as we should go in upholding a sentencing process lacking the participation of the judge who presided at the trial. To go further in this sole remaining case of resentencing due to abolition of the mandatory death sentence, and direct the designation of still another judge, finds no solid support in any applicable law, Rule or decision.

■ 3. There remains the precedent set by Frady and Gordon v. United States, *supra.* Faced there with a comparable problem we requested the United States Attorney and other counsel to present their views to the court *en banc* as to how we should dispose of the appeal should we sustain the convictions but find error in the jury poll or otherwise in the sentencing procedure followed in those cases. The United States responded in its brief:

We think that under 28 U.S.C. § 2106 this court has the power to modify the judgment by providing for a life sentence or by remanding the case to the District Court with directions to do so.

This response of the United States was no doubt due to the fact that if the death sentences in the *Frady and Gordon* cases were set aside by this court

8. That Section 2106 is available in criminal cases see Ballew v. United States, 160 U.S. 187, 16 S.Ct. 263, 40 L.Ed. 388; Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335.

because of certain errors undermining their validity the proper procedure for sentencing could not be reconstructed in the District Court. It followed that the death sentences could not again be imposed. The United States accordingly recognized that this court had authority under Section 2106 to place in effect life imprisonment, the sole alternative punishment permitted by statute. Here too, for somewhat different reasons,[9] the sentencing procedure contemplated by statute, and by Rule 25, cannot be reconstructed, and here too, for reasons already stated, we cannot sustain the present death sentence. Here too, only one other sentence is possible. Congress did not provide a permissible range of sentences dependent upon the discretion of the judge, other than the range between life and death. Notwithstanding the great difference between these two, the sentence must be either one or the other. There is no other latitude such as is usually given to a sentencing judge. Since the present death sentence cannot be sustained, and since the sentencing process necessary to support a validly imposed death sentence cannot be reconstructed so as to conform with the means established by Congress, the sole other possible sentence authorized by Congress, life imprisonment, shall be put into effect. As we stated the matter in Frady and Gordon v. United States, *supra:*

> Since it is not possible to reconstruct the situation as it might have been but for the errors referred to, or to leave the death sentences in effect, resort is had to the punishment of life imprisonment, the only alternative. This, to quote the language of Section 2106, is "just under the circumstances."

We may add, though this is unnecessary to our decision, that no one recommends capital punishment in this case. The United States refrains from doing so. The Probation Officer recommends against it. The two Chaplains, one Protestant, one Catholic, recommend against it. The testimony indicates that during these past years appellant has not only been penitent and remorseful, but has become a most likely subject for rehabilitation and influence for good in the prison. The testimony of the Protestant Chaplain quoted above is particularly impressive. In the discipline of prison, even during his years on death row, appellant has been able to achieve an ordered and useful life which he disastrously failed to achieve in liberty. An orderliness acquired as a consequence of his disordered deed takes the place of the liberty forfeited by the deed.

The loss of Officer Brereton would not be restored by appellant's execution; nor the woe caused by that loss assuaged. Appellant is not to escape punishment. He is to be sentenced to imprisonment for life, a sentence authorized by Congress for his crime.

The sentence is set aside and the case is remanded with direction that appellant be sentenced to life imprisonment.

TAMM, Circuit Judge, with whom DANAHER and BURGER, Circuit Judges, concur, dissenting:

I would affirm the trial court's decision on the grounds that the death sentence was validly imposed in this case and that this court is without legal authority to revise a lawful sentence and to impose a different one.

I

In Coleman v. United States, 118 U.S. App.D.C. 168, 334 F.2d 558 (1964), referred to as *Coleman II*, we remanded this case to the District Court to conduct an inquiry pursuant to the 1962 statute abolishing the mandatory death sentence in this jurisdiction, 22 D.C.Code § 2404 (Supp. IV 1965), so that "the judge may, *in his sole discretion*, consider circumstances in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of life imprisonment, in which

---

9. In *Frady and Gordon* jury participation was required in the sentencing process, and this could not be afforded there on remand to the District Court. The trial jury had disbanded.

event he shall sentence the defendant to life imprisonment." (Emphasis added.) Appellant had previously been given the mandatory death sentence on June 30, 1960, as was required for first degree murder convictions at that time.

District Judge McGarraghy conducted such an inquiry, in which the appellant was afforded every opportunity—virtually without restriction—to present to the court those factors in his case which he felt should mitigate against the death penalty. The excellence of the record which was developed at that hearing through the combined efforts of appellant's court appointed counsel and the United States Attorney's office has been noted in the majority opinion. It is apparent from Judge McGarraghy's detailed memorandum that he carefully considered all of the factors presented to him and in his discretion concluded that "[u]pon consideration of all the circumstances in mitigation and in aggravation, it is the determination of the Court that the case, in its opinion, does not justify a sentence of life imprisonment * *." Clearly the judge complied in every respect with our remand and with the statutory provisions. It is not within the province of this court to superimpose its judgment or the personal convictions of its individual members upon a District Court judge when that judge sentences a defendant within the legal limits of the statute under which the defendant was convicted.

Recently, in a case involving another defendant sentenced to death under the former law but whose sentence was reviewed upon enactment of the 1962 amendment, this court, sitting en banc, stated the law which governs this type of situation:

"It is clear beyond peradventure that this court had and has no control over a sentence which comports with the applicable statute, 'even though it be a death sentence.' Nor may we reduce or modify a sentence nor require a trial judge to do so." Jones v. United States, 117 U.S.App.D.C. 169, 327 F.2d 867, 869–870 (1963).

Nevertheless, in the case before us, the majority opinion proceeds to substitute appellate judges' judgment of the circumstances in mitigation and aggravation for that of Judge McGarraghy. In the opinion, my brethren do not deny that the District Court judge permitted the hearing to cover as broad a field of "circumstances in mitigation" as they would consider relevant to the question of punishment in this case. (See maj. op., at 566). However, the majority would place greater weight on certain factors which Judge McGarraghy permitted to be developed but found not to be persuasive. The fact that judges may differ in weighing the various factors in mitigation and aggravation in a given case does not constitute an abuse of discretion on the part of the District Court judge which would justify reversal. The question of whether the death penalty is a proper punishment for crime is peculiarly one of legislative policy. Once the Congress has decided to provide for capital punishment, federal appellate courts lack the power to review any sentence, including a death sentence, validly imposed, Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), particularly where the sentencing judge in reaching his decision has considered the very circumstances which the appellate court deems significant.

Assuming, however, for purposes of discussion that we could legitimately find that the trial judge erred in failing to consider certain circumstances in this case as mitigating, the law is equally as clear that this court lacks the authority to modify the death sentence and itself impose a sentence of life imprisonment.

The majority relies on Section 2106 of Title 28 United States Code,[1] which gives

---

1. "§ 2106. DETERMINATION

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or or-

appellate courts the power to "affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review," as authority for this court's imposing a life sentence under the circumstances of this case. However, the Supreme Court cases which have held this statute applicable to criminal cases have thus far restricted the authority contained in Section 2106 to such action as the ordering of a new trial, Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), or the remanding for resentence, Ballew v. United States, 160 U.S. 187, 203, 16 S.Ct. 263, 40 L.Ed. 388 (1895). The majority opinion cites no authority outside this jurisdiction to the effect that Section 2106 permits an appellate court to modify a sentence which is within the applicable criminal statute and to impose a sentence of its own. Indeed, no such authority exists.

There is, in fact, strong and persuasive authority to the contrary. The case of Gurera v. United States, 40 F.2d 338, 340–341 (8th Cir. 1930) succinctly summarized the federal non-review rule: "If there is one rule in the federal criminal practice which is firmly established, it is that the appellate court has no control over a sentence which is within the limits allowed by a statute." The Supreme Court in Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), upheld the imposition of consecutive sentences on multiple counts, deferring to the decision of the trial court as regards the sentence:

"Under the circumstances, so far disclosed, it is true that the imposi-

tion of the full penalty of fine and imprisonment upon each count seems unduly severe; but there may have been other facts and circumstances before the trial court properly influencing the extent of the punishment. In any event, the matter was one for that court, with whose judgment there is no warrant for interference on our part."

Several courts of appeals, including this circuit, have reiterated this rule in numerous cases.[2] The first case which considered whether Section 2106 confers authority to reduce a sentence which is not outside the bounds set by a valid statute also involved a death sentence. In United States v. Rosenberg, 195 F.2d 583, 604 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, rehearing denied, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 652 (1952), the court adhered to the rule based on "sixty years of undeviating federal precedents * * * that an appellate court has no power to modify a sentence." Judge Frank, however, expressed his own view that Section 2106, which had never been considered in this context before—though it dates back to the Judiciary Act of 1789—might possibly be interpreted to allow such a review. Nevertheless, Judge Frank concluded that since "for six decades federal decisions, including that of the Supreme Court in Blockburger v. United States, *supra,* have denied the existence of such authority, it is clear that the Supreme Court alone is in a position to hold that Sec. 2106 confers authority to reduce a sentence which is not outside the bounds

der, or require such further proceedings to be had as may be just under the circumstances."

**2.** E.g., Jones v. United States, *supra,* (D.C.Cir. 1963); United States v. Pruitt, 341 F.2d 700 (4th Cir. 1965); United States v. Martell, 335 F.2d 764 (4th Cir. 1964); Mount v. United States, 333 F.2d 39 (5th Cir.) cert. denied, 379 U.S. 900, 85 S.Ct. 188, 13 L.Ed.2d 175 (1964); Martin v. United States, 317 F.2d 753 (9th Cir. 1963); Smith v. United States, 273 F.2d 462 (10th Cir. 1959), cert. de-

nied, 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729 (1960); Egan v. United States, 268 F.2d 820 (8th Cir.), cert. denied, 361 U.S. 868, 80 S.Ct. 130, 4 L.Ed.2d 108 (1959); United States v. Kapsalis, 214 F.2d 677 (7th Cir. 1954), cert. denied, Robinson v. United States, 349 U.S. 906, 75 S.Ct. 583, 99 L.Ed. 1242 (1955); United States v. Rosenberg, 195 F.2d 583, 604 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, rehearing denied, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 652 (1952).

set by a valid statute."[3] 195 F.2d at 605–607.

The Supreme Court has refused to follow Judge Frank's suggested interpretation of Section 2106. In Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 1285 (1958), the Court declined "to enter the domain of penology and more particularly that tantalizing aspect of it, the proper apportionment of punishment. * * * First the English and then the Scottish Courts of Criminal Appeal were given the power to revise sentences, the power to increase as well as the power to reduce them. * * * *This Court has no such power.*" (Emphasis added). See Herman v. United States, 289 F.2d 362, 369 (5th Cir.) cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961); Smith v. United States, 273 F.2d 462, 467–468: (10th Cir. 1959), cert. denied, 363 U.S. 846, 80 S.Ct. 1619 (1960).

Efforts have been made in the Congress to enact legislation to provide for appellate review of sentences. Bills were introduced in the last three preceding terms of the Senate which would grant such authority.[4] None of these was ever reported out of the Senate Judiciary Committee. There are no similar proposals pending in the present Congress.

The only case in which Section 2106 has been relied on as authority for an appellate court to reduce a validly imposed sentence is this court's decision in Frady and Gordon v. United States, supra. Assuming for the moment that the court's action in that case of imposing life sentences on the defendants was proper, which is of course doubtful in view of the above discussion, the peculiar circumstances which prompted a majority of the court to impose its own sentence rather than to remand to the District Court for sentencing by a trial judge are not present in this case. The determination of the punishment for Frady and Gordon, whose convictions were affirmed, was made by the jury, which found them guilty of first degree murder. This court, however, found that the instructions on the sentencing alternatives available to the jury and the jury poll were in error. Since it was impossible to reconvene the same jury to reconsider the punishment and since a majority of the court was unable to agree that a two-step trial was authorized by Section 2404 of Title 22, District of Columbia Code, the court chose, under the guise of Section 2106, to impose a life sentence on the defendants rather than to remand to the trial court to hear evidence in mitigation and aggravation. No explanation or justification was given as to why this 76 year old law was suddenly to be so interpreted. I might add that no evidence in mitigation or aggravation was ever presented to this court to aid it in deciding to reduce the death sentences of Frady and Gordon.

Here, by express order of this court, the District Court has conducted an extensive inquiry into the circumstances bearing on the punishment of the defendant Coleman. If the judge who heard the evidence was in error in not affording weight to certain of the circumstances developed before him, then the only proper course which this court may take is to remand the case with instructions to consider those factors in mitigation which the court deems significant. If it is felt that because Judge McGarraghy has twice sentenced Coleman to death he would be unable to view the evidence as

---

3. The Supreme Court denied certiorari, 344 U.S. 838, 73 S.Ct. 20 (1952), and later denied a petition for rehearing in which Mr. Justice Frankfurter filed a separate memorandum opinion stating:

"One of the questions, however, first raised in the petition for rehearing, is beyond the scope of the authority of this Court, and I deem it appropriate to say so. A sentence imposed by a United States district court, even though it be a death sentence, is not within the power of this Court to revise." Rosenberg v. United States, 344 U.S. 889, 890, 73 S.Ct. 134, 135 (1952).

4. S. 823, 88th Cong., 1st Sess. (1963); S. 2879, 87th Cong., 2d Sess. (1962); S. 3914, 86th Cong. 2d Sess. (1960).

instructed with impartiality, then the court's order could require that another of the remaining fourteen fair and able judges on the District Court be chosen to sentence the defendant. To do otherwise is to tacitly express a basic distrust for the ability of the trial court to follow the dictates of this court and to discharge its duties according to law.

Whatever our personal convictions of the efficacy of capital punishment for crime, "the remedy must be afforded by act of Congress, not by judicial legislation under the guise of construction." Blockburger v. United States, *supra*.

## II

The majority persists in its view that Judge McGarraghy committed errors in failing to find that appellant's case "justifies a sentence of life imprisonment," when, in reality, its only ground for reversal is that it disagrees with the sentencing judge's decision. In so doing, the majority completely ignores the language of the amendatory act and the interpretation given that act in both the *Jones* and *Coleman II* cases (*infra*).

To begin with, the majority opinion finds that Judge McGarraghy was wrong in not considering the previous sentence of death as being "lifted" by the remand in *Coleman II.* For this reason, my brethren say, "it was error to consider the matter as though the burden was upon appellant to convince the court that the sentence should be reduced." However, in the next paragraph they admit "[i]t is true that a majority of this court, in remanding the case in *Coleman II,* did not join in stating that the duty of the trial judge was that of resentencing."

This is pure understatement.

In Jones v. United States, 117 U.S.App. D.C. 169, 327 F.2d 867, 870–871 (1963), a majority of this court considered and decided this very point:

"The conclusion is inescapable that the death sentence not only was mandatory, final and unreviewable, but that sentence had not been vacated by the amendatory Act. There remained to the appellant only the possibility of relief to be accorded pursuant to the proviso. The judge was authorized 'in his sole discretion' to take two steps: to (1) '*consider circumstances* in mitigation and in aggravation and [2] *make a determination* as to whether the case in his opinion justifies a sentence of life imprisonment * * *.' Should he decide that life imprisonment was appropriate he was to resentence the appellant 'in accordance with the provisions of this Act.'" (Emphasis supplied by the court.)

The majority in *Coleman II* remanded the case to the District Court "only that the judge may conduct an inquiry and the appellant be afforded a hearing" to allow a thorough development of circumstances in mitigation and aggravation pursuant to the amendatory act proviso. 334 F.2d at 566. There was no mention in that opinion of setting aside the previous death sentence. The concurring opinion of Judge Burger, joined in by Judge McGowan, was more explicit:

"In Jones v. United States, supra, we held that sentences imposed prior to the effective date of the amendatory Act were not vacated by that Act; however, we stated that 'should [the judge] decide that life imprisonment was appropriate he was to resentence appellant * * *.' 327 F.2d at 871. *Thus 'resentencing' would occur only when the original sentence is altered.*" 334 F.2d at 568. (Emphasis added).

If the appellant does not have the burden under these rulings of justifying a resentencing from an existing penalty of death to life imprisonment, it is difficult to envision who does. Certainly it is not the United States Attorney, who has consistently maintained no interest in the particular sentence imposed on a validly convicted defendant and has refused to make sentencing recommendations in any cases. If perhaps the suggestion found

in the concurring opinion in *Jones*, 327 F.2d at 877, that "Congress placed the burden on the court to avail itself of all relevant information which may be helpful in imposing the proper sentence" is to be taken literally, then it is clear that Judge McGarraghy sustained that burden by permitting the widest scope of circumstances in mitigation and aggravation conceivable in this case to be developed before him.

Thus, when the district judge, after hearing and studiously considering all of the evidence before him, rendered his opinion that the case did not justify a sentence of life imprisonment and, therefore, held "that the sentence shall be governed by the provisions of law in effect prior to the effective date of Public Law 87–423," he was not—as the majority contends—affording weight to the previous mandatory death sentence but was merely paraphrasing the statute which expressly states this to be the law unless the judge finds a life sentence justified. It is difficult to imagine how a judge who follows a statute as the Congress has written it and this court has interpreted it can, in so doing, be said to have committed procedural error.

What in essence my brethren are really saying is that they disagree with the district judge in his assessment of the factors in mitigation and aggravation and would themselves have found a life sentence justified. However, they are plainly without legal authority to substitute their views for those of the judge charged by Congress with the "sole discretion" to decide life or death in this situation. As we said in *Coleman II*, "Congress chose to rely upon the experience, training and expertise of the judge who was to make the appropriate determination." 334 F.2d at 563. Congress did not provide anyone else, including this court, with the power to overrule that determination.

The majority finds that Judge McGarraghy erred in failing to find certain circumstances, including appellant's apparent social inadequacies, in mitigation

of punishment. The appellant was convicted of the felony-murder of a police officer while perpetrating a robbery. This is the circumstance in aggravation —against which all other possible mitigating circumstances must be weighed. It is clear from the sentencing judge's detailed memorandum that "in his opinion" none of the other circumstances mitigated against the death sentence for the murder of a policeman. Perhaps they might have had the appellant, for example, merely stolen a loaf of bread or a bottle of whiskey, but not where in addition an officer's life was lost in the process.

My brothers emphasize such factors as "the absence of premeditation, the fact that appellant was unarmed at the time, that he panicked, that the homicide was sudden and unplanned by a mentally retarded man whose mind was further clouded by drink," which factors they personally feel should have played a greater role in Judge McGarraghy's process of deliberation. It must be pointed out, however, that the very nature of most felony-murders is that they are the result of sudden, though certainly foreseeable, killings of innocent people in the course of the commission of a serious felony. The high risk that a police officer may be killed when fleeing felons panic upon being confronted by his unexpected presence is one of the reasons Congress has made this a first-degree murder crime, carrying a possible penalty of death. The fact that the appellant was unarmed at the time was only because he had given *his own gun* to his brother for use in the robbery. Moreover, there is no evidence that the appellant was mentally incapacitated at the time of the murder. It is difficult to see how these circumstances can mitigate against punishment for a crime when they contributed substantially to the crime's occurrence.

The recommendation of the Catholic and Protestant chaplains and the probation officer against the death penalty in this case are also afforded much weight

by the majority. We are indeed naive if we expect that these individuals, whose profession it is to save souls and to rehabilitate men, would testify in favor of the imposition of the death penalty.

The present justification for this court's imposition of a life sentence on the appellant is completely without legal foundation. The majority interpret the amendatory Act as implying that the "trial judge" who presided at Coleman's jury trial should determine the sentence to be imposed. Since he is unavailable and since the judge designated in his place is unacceptable to the majority because they disagree with him, they conclude that they cannot redesignate another judge to reconsider the evidence in accordance with their opinion.

First, it must be pointed out that the phrase "trial judge" does not appear in § 2404 of Title 22 D.C.Code. Moreover, in *Coleman II* we considered this very point and concluded that "[t]here is nothing in the amendatory Act to suggest that 'the judge' who might be asked to consider a post-trial motion for relief must be the trial judge and no other." 334 F.2d at 564. Section 2106 would appear to give this court authority to remand the case to the District Court with instructions that a judge other than Judge McGarraghy be designated to reconsider the circumstances in mitigation and aggravation. Cf. Ballew v. United States, 160 U.S. 187, 16 S.Ct. 263, 40 L.Ed. 388 (1895).

I fear the majority is acting only from expediency and with grave shortsightedness in seizing Section 2106 as a basis for supervising sentences. The exceptions which will be developed by such a subjective standard can only depend on the likes, dislikes, prejudices and sympathies of judges who, however well-intentioned, are in fact substituting a personal philosophy of what is best for our civilization as a replacement for Acts of Congress and other existing laws. This unfortunately but necessarily results in a rule of men, unsupported either by statute or other legal authority.